IN THE

# ARIZONA COURT OF APPEALS
DIVISION TWO

———————————————

THE STATE OF ARIZONA,
*Appellee*,

*v.*

ROSA ELENA BECERRA,
*Appellant*.

No. 2 CA-CR 2014-0295
Filed January 25, 2016

———————————————

Appeal from the Superior Court in Pima County
No. CR20111519001
The Honorable Scott Rash, Judge

**AFFIRMED**

———————————————

COUNSEL

Mark Brnovich, Arizona Attorney General
Joseph T. Maziarz, Section Chief Counsel, Phoenix
By Amy Pignatella Cain, Assistant Attorney General, Tucson
*Counsel for Appellee*

Steven R. Sonenberg, Pima County Public Defender
By Erin K. Sutherland, Assistant Public Defender, Tucson
*Counsel for Appellant*

---

**OPINION**

---

Judge Miller authored the opinion of the Court, in which Judge Espinosa concurred and Chief Judge Eckerstrom dissented.

---

M I L L E R, Judge:

¶1        Rosa Becerra was convicted after a jury trial of possession of drug paraphernalia and methamphetamine for sale and sentenced to a combined prison term of five years.  On appeal, she contends the trial court erred in denying her motion to suppress the methamphetamine when it concluded that her written and oral consent to search her car included inspection by a drug-detection dog (K-9).  For the reasons that follow, we affirm.

**Factual and Procedural Background**

¶2        In reviewing a trial court's ruling on a motion to suppress, the appellate court considers only the evidence presented at the suppression hearing.  *State v. Spears*, 184 Ariz. 277, 284, 908 P.2d 1062, 1069 (1996).  In addition, we "view the facts in the light most favorable to sustaining the trial court's ruling."  *State v. Gonzalez*, 235 Ariz. 212, ¶ 2, 330 P.3d 969, 970 (App. 2014).  Only the officer who conducted the search testified at the suppression hearing.

¶3        In 2011, a Department of Public Safety officer stopped Becerra's car for speeding and a cracked windshield.  After issuing a written warning for the traffic violation and a repair warning for the windshield, the officer asked Becerra if he could search the vehicle, to which she said yes.  The officer then gave her a consent-to-search form, which stated in both English and Spanish:

> I, [name], give consent to search my vehicle
> and any of its contents under my control.  I
> understand that:

(1) I can refuse to allow my vehicle to be searched.

(2) I can withdraw my consent to search at any time.

(3) Any evidence found during this search can be used against me in court.

(4) This consent does not include property of any individual adult passengers. Separate consent must be obtained from those individuals.

After confirming that Becerra could read Spanish, the officer asked her to read through the form and sign it if she agreed, and added that if she had any questions she could ask him. She signed the Spanish portion of the form. He asked her if she understood the form, and she said yes.[1] Their conversation was in English.

¶4    The officer directed Becerra and her passengers to exit the car and stand on a sidewalk about twenty feet from the car. He went to his patrol car, which was parked behind Becerra's car, and retrieved his K-9. The officer testified that his patrol car was visible from the sidewalk and Becerra was able to see him take the K-9 out of the patrol car. Becerra was standing close enough that the officer "[m]ost definitely" could have heard her if she had said something to him, but she did not. He testified that throughout the investigation, he never saw or heard her do or say anything to indicate that she withdrew her consent to search the car.

---

[1]After the opening brief was filed in this appeal, the United States Supreme Court issued its opinion in *Rodriguez v. United States*, ___ U.S. ___, ___, 135 S. Ct. 1609, 1612 (2015), holding that police may not prolong an otherwise-completed traffic stop to conduct a dog sniff absent reasonable suspicion of criminal activity. Because the parties disagreed as to what effect *Rodriguez* might have on the present case, we solicited supplemental briefing. We conclude the record does not permit us to address the issue and express no opinion about its application here.

**¶5**        The officer had the K-9 conduct an exterior sniff of Becerra's car by walking all the way around it.  The K-9 did not alert to the exterior of the car.  The officer next directed the K-9 to sniff the interior of the car.  The K-9 alerted to a purse placed on the driver's seat.[2]  The officer returned the K-9 to his vehicle and then searched the purse, finding the methamphetamine inside.

**¶6**        In her motion to suppress Becerra argued the seizure of the methamphetamine violated the Fourth Amendment because the use of a K-9 to sniff the interior of the car exceeded the scope of her consent.  The trial court denied the motion, finding Becerra freely and intelligently consented to a search and the actual search remained within the bounds of her consent.  A jury found her guilty of the charge and after she was convicted and sentenced as described above, she appealed.  We have jurisdiction pursuant to A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A)(1).

## Consent to Search Vehicle With K-9

**¶7**        A warrantless search of a car without the driver's consent or probable cause to believe it contains contraband or other evidence of a crime violates the Fourth Amendment.  *See* U.S. Const. amend. IV; *California v. Carney*, 471 U.S. 386, 390 (1985) (automobile exception to warrant requirement justified by lessened expectation of privacy in vehicle); *see also* Ariz. Const. art. II, § 8; *State v. Reyna*, 205 Ariz. 374, 375, ¶ 5, 71 P.3d 366, 367 (App. 2003).  Because the state did not assert the officer had probable cause to search her car, Becerra's consent was the only issue addressed at the suppression hearing.  We review the trial court's ruling on a motion to suppress for an abuse of discretion.  *State v. Butler*, 232 Ariz. 84, ¶ 8, 302 P.3d 609, 612 (2013).

**¶8**        Determining the validity of a law enforcement officer's search based on consent generally involves two factors:  (1) whether the consent was voluntarily given and (2) whether the search was within the scope of the consent.  *See State v. Paredes*, 167 Ariz. 609,

---

[2]Becerra conceded in her motion that the purse belonged to her.

612-13, 810 P.2d 607, 610-11 (App. 1991). Becerra acknowledges that her oral and written consent was voluntary. Her single contention on appeal, as she argued below, was that the scope of her consent did not reasonably extend to a search of the inside of her car by the officer's K-9.

¶9        A general consent to search is unqualified, absent any announcement of the object of the search or other express limitation, subject only to the bounds of reasonableness. *See United States v. McWeeney*, 454 F.3d 1030, 1034-35 (9th Cir. 2006). Even after a person initially consents to a search, she nevertheless remains free to withdraw or narrow the scope of her consent at any time. *Id.* at 1034. "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness — what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). [3]

¶10        Becerra argues "no reasonable person would believe that a dog was going to be placed into the interior of their vehicle" when consenting to a search. She reasons that absent an explicit question by the officer, such as "whether he and his dog could search," the officer should assume consent does not include the assistance of a K-9. She supports her reasonable person argument with examples of why some people do not want dogs around them or their property: the presence of hair, claws, saliva, and indiscriminately wagging tails. Although it is undoubtedly true that

_____

[3]In its expanded statement of the issue, the Court actually asks whether *the officer's beliefs* about the consent exchange were "objectively reasonable." *Jimeno*, 500 U.S. at 249, 251. An officer's beliefs, to be objectively reasonable, must be based on what a reasonable lay person in those circumstances would have believed. For instance, in *State v. Ahumada*, which relied on *Jimeno*, the court discussed circumstances from which the officer might have concluded the scope of consent included a search of the pockets, but based its holding on what "reasonable persons" would have understood. 225 Ariz. 544, 546, ¶¶ 7, 14, 241 P.3d 908, 910, 912 (App. 2010).

some people prefer to avoid dogs for those reasons, the issue of objective reasonableness to determine the scope of a consent to search does not turn on the personal likes or dislikes of the defendant, or even the preferences of a group of people. *See, e.g., United States v. Marshall*, 348 F.3d 281, 287 (1st Cir. 2003) (consenting party's subjective belief irrelevant). Instead, it depends on the rational beliefs and knowledge of a reasonable person. For instance, in *Jimeno*, the defendant argued and the Florida appellate court agreed that consent to search a vehicle would not reasonably include the closed containers within it. 500 U.S. at 250. The Supreme Court rejected this per se rule, however, because a "reasonable person *may be expected* to know that narcotics are generally carried in some sort of container." *Id.* at 251 (emphasis added). Here, the issue is whether a person who has generally consented to a search of her vehicle may expect that a law enforcement officer could use a K-9 to assist in the search.

**¶11** K-9s have assisted law enforcement officers conducting searches for more than a century because of their superior olfactory abilities. *See, e.g., Hodge v. State*, 13 So. 385, 385 (Ala. 1893) (search capabilities of K-9s "common knowledge" by 1893); *see also* Charles F. Sloane, *Dogs in War, Police Work and on Patrol*, 46 J. Crim. L. & Criminology 385, 388 (1955) (noting dogs have been used to track criminals since at least fifteenth-century England). They have been used to detect drug contraband for more than forty years. *See, e.g., United States v. Fulero*, 498 F.2d 748, 749 (D.C. Cir. 1974) (per curiam) (marijuana-sniffing K-9 "had been working at the port of entry at San Luis, Arizona regularly for at least two years" by time of trial). In fact, K-9s are a ubiquitous part of modern law enforcement. *See, e.g., United States v. Howard*, 448 F. Supp. 2d 889, 891 (E.D. Tenn. 2006) (noting the "great number of criminal cases" involving drug detection K-9s); *see also* Charles L.W. Helm, Note, *A Huff and a Puff Is No Longer Enough: How the Supreme Court Built a House of Bricks With Its Decision In* Florida v. Jardines, 9 Liberty U.L. Rev. 1, 12 (2014) (noting that in addition to drug investigations, K-9s are used "to find missing persons, sweep for explosives, find remains of murder victims, locate discarded pieces of evidence, or even assist fire investigators in determining if an accelerant might have been used").

¶12 Knowledge about the role of K-9s in law enforcement is not limited to criminal justice circles. Many patrol vehicles display prominent signs that the officer is accompanied by a K-9. *See, e.g.*, *People v. Bell*, 51 Cal. Rptr. 2d 115, 117 (Ct. App. 1996) (noting "patrol car was marked 'K-9'"), *abrogated on other grounds by People v. Brendlin*, 136 P.3d 845 (Cal. 2006), *vacated*, *Brendlin v. California*, 551 U.S. 249 (2007). In fact, placing K-9 markings on a private car may be particularly important in determining whether a person is attempting to impersonate a police officer. *See State v. Beaubrun*, 36 So. 3d 897, 900 (Fla. Dist. Ct. App. 2010).

¶13 The training and work of K-9s is recognized in widely viewed documentaries, such as ones produced by National Geographic and Animal Planet. *See Alpha Dogs*, National Geographic, http://channel.nationalgeographic.com/wild/alpha-dogs/ (last visited Jan. 8, 2016); *K-9 Cops Videos*, Animal Planet, http://www.animalplanet.com/tv-shows/other/videos/k9-cops/ (last visited Jan. 8, 2016). K-9s even have a place in popular culture as demonstrated by their leading roles in movies and television. *See, e.g.*, *K-9* (Universal Pictures 1989); *Rin Tin Tin: K-9 Cop* (The Family Channel 1988-93). The reasonable person in the United States would not be surprised or find any novelty in a law enforcement officer's use of a K-9, just as he or she might use a flashlight, to search a vehicle for drug contraband. Therefore, we cannot accept Becerra's contention that the constitution mandates a per se rule excluding K-9s from the scope of a general consent and requiring officers to explicitly ask for permission to search with a K-9.

¶14 Rejection of Becerra's proposed bright-line rule does not mean adoption of the opposite rule—*i.e.*, everyone must assume a K-9 will be used in all searches. Instead, trial courts must look to the totality of the circumstances in the exchange between the officer and person to determine whether a consensual search remained within the bounds of the consent actually given, and appellate courts will affirm the trial court's judgment absent clear error. *State v. Swanson*, 172 Ariz. 579, 583, 838 P.2d 1340, 1344 (App. 1992). Arizona precedent and persuasive federal case law guide our consideration of the suppression ruling.

**¶15**         In *State v. Paredes*, this court held the trial court erred in concluding that the use of a K-9 in a vehicle search exceeded the scope of a general consent.  167 Ariz. at 613, 810 P.2d at 611.  In that case the officer had asked if he "could look through the vehicle," Paredes consented, and then the officer retrieved his K-9 from the patrol vehicle.  *Id.* at 610, 810 P.2d at 608.  In rejecting Paredes's argument, we observed that when he consented, the K-9 was on the scene and "the defendant did not revoke his consent when the dog was brought to the vehicle."[4]  *Id.* at 613, 810 P.2d at 611.  Finding instructive the Fifth Circuit's reasoning in *United States v. Gonzalez-Basulto*, 898 F.2d 1011 (5th Cir. 1990) (per curiam), we found the presence of the K-9 and the absence of an objection by the defendant or revocation of his consent crucial to our determination that the trial court had erred by granting the motion to suppress.  167 Ariz. at 613, 810 P.2d at 611.

**¶16**         In *Gonzalez-Basulto*, border patrol agents at an immigration checkpoint asked the defendant if he would "mind opening the trailer for an inspection," to which he replied, "'No problem.'"  898 F.2d at 1012.  Unlike the officer here, the border patrol agents did not inform Gonzalez-Basulto of his right to refuse or to withdraw consent to search.  *Id.* at 1013.  Nonetheless, the court held that because the defendant could observe K-9s at the checkpoint before he gave his consent and he stood by silently as the K-9 entered the trailer, the district court properly concluded search with a K-9 did not exceed the scope of consent.  *Id.*  Becerra provides no authority rejecting the reasoning in *Gonzalez-Basulto*, and our own research discloses general acceptance of it.  *See, e.g.*, *Bell*, 51 Cal. Rptr. 2d at 126 (defendant who knew officer was accompanied by K-9 should expect it would assist search); *Castro v. State*, 755 So. 2d 657, 659 (Fla. Dist. Ct. App. 1999) (no objection when K-9 began search).

---

        [4]Becerra contends this language is dicta because the K-9 in *Paredes* also alerted to the trunk, but we conclude the holding cannot be limited to an exterior search, especially in light of the court's reliance on *United States v. Gonzalez-Basulto*, 898 F.2d 1011 (5th Cir. 1990) (per curiam).

¶17         Both parties cite *United States v. Woods*, 445 F. Supp. 2d 1328 (M.D. Ala. 2006), as additional persuasive authority.  In that case a police officer stopped the defendant's car based on reasonable suspicion that the defendant was involved in drug activity.  *Id.* at 1330.  The defendant denied having contraband in the car.  *Id.*  "'So, you don't mind if I search it?'" the officer asked, and the defendant replied, "'[N]o.'"  *Id.*  The officer began to search inside the vehicle.  *Id.*  About ten minutes into the stop, a K-9 team arrived.  *Id.*  The handler spoke to the defendant for a few minutes.  *Id.*  The K-9 subsequently alerted to drugs hidden in the center console.  *Id.* at 1330-31.  In denying the defendant's motion to suppress the drugs, the court reasoned that "before the canine search began, [the defendant] had been fully aware for some time of the dog's presence and its purpose; that a canine search ensued as part of [his] consent came as no surprise to anyone present."  *Id.* at 1332.  The defendant "'had ample opportunity to limit the scope of the search, or request that it be discontinued'" after realizing a K-9 would be used, but he did not do so.  *Id.*, *quoting United States v. Harris*, 928 F.2d 1113, 1117-18 (11th Cir. 1991).  On these facts, the court concluded that the defendant's general consent to a search of the car reasonably included the use of a drug-sniffing K-9 in the interior of the car where narcotics might reasonably be hidden.  *Id.* at 1332-33.

¶18         Becerra attempts to distinguish *Paredes*, *Gonzalez-Basulto*, and *Woods* on the basis that in each case "it was abundantly clear to the defendant that dogs were being utilized for the vehicle searches prior to obtaining the consent or conducting the search."  She essentially argues the facts in those cases are more compelling, but by this argument also implicitly contends the trial court committed clear error in finding that the search with the K-9 "was within the bounds of consent."  We disagree.  There was sufficient evidence that Becerra, like the defendant in *Woods*, was "fully aware . . . of the dog's presence and its purpose" before the K-9 entered the vehicle.  445 F. Supp. 2d at 1332.  Moreover, as in *Paredes*, *Gonzalez-Basulto*, and *Woods*, the trial court had before it uncontested evidence that Becerra did not object when presented with unambiguous indications that the officer would use a K-9 to assist in the search.  On this record, we cannot conclude the trial court committed clear error in its factual finding regarding the scope of consent.

**¶19** Becerra also relies on *Dominguez v. State*, 616 So. 2d 506 (Fla. Dist. Ct. App. 1993), to distinguish *Woods*. There, the defendant consented to a warrantless search of his apartment for narcotics. *Id.* at 506. Fifteen minutes later, a K-9 was brought to the scene. *Id.* at 506-07. After the K-9 alerted to a sink in the apartment, the officers opened the wall behind the sink to find narcotics hidden there. *Id.* at 507 & n.1. The court found the use of the K-9 exceeded the reasonable scope of the defendant's consent. *Id.* at 507. But *Dominguez* is distinguishable for two reasons. First, the court was careful to note that its holding rested on the absence of any "circumstances from which consent to the use of the drug detection dog could be reasonably implied." *Id.* For instance, it distinguished *Gonzalez-Basulto* because the K-9s were "openly used and *were visible to [the] defendant.*" *Id.* (emphasis added). Likewise, the K-9 was visible to Becerra. Second, the court emphasized that the search in question was an invasive search of a private home, where one's reasonable expectation of privacy under the Fourth Amendment is at its apex. *Id.* The court thus scrutinized defendant's consent "'with special care.'" *Id.*, quoting *Gonzalez v. State*, 578 So. 2d 729, 734 (Fla. Dist. Ct. App. 1991). Courts have long recognized that one has a lesser expectation of privacy in a vehicle than in a private home. *See, e.g.*, *Carney*, 471 U.S. at 390-91; *Carroll v. United States*, 267 U.S. 132, 153 (1925). Similarly, cases involving a K-9 brought onto the curtilage of a home are inapposite. *See Florida v. Jardines*, ___ U.S. ___, ___, 133 S. Ct. 1409, 1415-16 (2013); *State v. Foncette*, 238 Ariz. 42, ¶¶ 15-16, 356 P.3d 328, 331-32 (App. 2015) (K-9 sniff of hotel hallway did not invade constitutionally protected area even though in close proximity to one).

### K-9 Exterior Vehicle Search Affecting Consent to Interior Search

**¶20** The dissent seemingly would adopt Becerra's proposed per se rule, or at least concludes the Fourth Amendment requires the state to show something more than the fact that the defendant had given a general consent to search and had been able to see the K-9 with the officer as the officer approached the vehicle to conduct the search. We will not repeat the discussion of Becerra's arguments our colleague finds persuasive, but separately consider his additional

reasoning that a K-9 exterior sniff eliminates a person's ability to withdraw her consent.

¶21 The dissent reasons that because law enforcement officers are not required to obtain consent for a K-9 sniff of the exterior of a car under *Illinois v. Caballes*, 543 U.S. 405 (2005), a person would never know the officer's intentions until the moment the K-9 was in the car. This rationale places too much weight on *Caballes.* First, even assuming a person knows she has no basis for objecting to an exterior sniff, it does not inhibit a reasonable person from asking whether the officer will direct the K-9 to enter the vehicle. For instance, Becerra was close by and easily could have made that inquiry but did not do so. Second, there was no evidence before the trial court establishing or even suggesting Becerra was surprised or concerned when the K-9 was directed to the driver's seat.[5] Had Becerra indicated that she only expected the K-9 to conduct an exterior sniff, the trial court could have considered that fact as part of the totality of the circumstances. *See, e.g.*, *State v. Ontiveros-Loya*, 237 Ariz. 472, ¶ 24, 352 P.3d 941, 948 (App. 2015) (scope of consent is question of fact to be determined from totality of circumstances). Finally, the argument contradicts the reasoning in *Paredes*, *Gonzalez-Basulto*, and *Woods*. The presence of the K-9 is the impetus for the person to make additional inquiries or to withdraw consent. In this respect, *Paredes* is directly on point because consent to search was given before the K-9 left the officer's patrol car. 167 Ariz. at 610, 613, 810 P.2d at 608, 611. Additionally, *Caballes* does not negate the reasoning in those cases because the defendant declined to give consent; therefore, the holding and the Court's reasoning does not apply here. 543 U.S. at 410 (K-9 exterior sniff during lawful traffic stop does not violate Fourth Amendment because it only reveals location of contraband person has no right to possess).

¶22 In sum, contrary to our dissenting colleague's characterization, we do not "contend that only an unreasonable person would be uncomfortable with a strange animal entering her

---

[5]It is not clear from the record that the K-9 actually entered the car; instead, it could have alerted to the purse as soon as the car door was opened. Nonetheless, we assume the K-9 entered the vehicle.

private space." Rather, we conclude that when a person has consented to a search of her vehicle after having been unequivocally informed the consent could be withdrawn at any time, a reasonable person would do so if she felt the use of a K-9 in conducting the search was objectionable or unacceptable for any reason. This conclusion is consistent with our jurisprudence and the protections of the Fourth Amendment.

## Disposition

¶23        For the reasons stated, the trial court did not abuse its discretion in denying Becerra's motion to suppress. We therefore affirm the convictions and the sentences imposed.

E C K E R S T R O M, Chief Judge, dissenting:

¶24        A person's general consent to a search, during a routine traffic stop, neither foreseeably nor reasonably includes an expectation that a dog will be invited into the interior of one's vehicle. Therefore, the state was obliged here to demonstrate that Becerra waived her Fourth Amendment right to protection from such an additional intrusion. Because Becerra had no legal duty to object to a search exceeding the scope of her consent, and because she could not divine the officer's unspoken intention to ultimately invite the dog inside her car even if she possessed such a duty, I cannot agree that her mere silence sufficed to demonstrate her consent to that intrusion.

¶25        When an officer conducts a search pursuant to consent, "[t]he scope of [that] search is generally defined by its expressed object." *Florida v. Jimeno*, 500 U.S. 248, 251 (1991). If an officer has not provided any express purpose for the search, the consent is understood as a general and unqualified consent. *United States v. Snow*, 44 F.3d 133, 135 (2d Cir. 1995). In that context, a defendant's failure to object to an action that would reasonably be perceived as part of the general search may be taken as consent. *See United States v. Starr*, 533 F.3d 985, 996 (8th Cir. 2008); *United States v. Gordon*, 173 F.3d 761, 766 (10th Cir. 1999); *Guy v. State*, 913 A.2d 558, 563-64 (Del. 2006).

**¶26**        But a general consent is not without limits.  A general consent "is constrained by the bounds of reasonableness: what a police officer could reasonably interpret the consent to encompass." *United States v. Strickland*, 902 F.2d 937, 941 (11th Cir. 1990).  Courts have found that a general consent does not encompass a search that destroys property, *see United States v. Osage*, 235 F.3d 518, 521-22 (10th Cir. 2000); *Strickland*, 902 F.2d at 941-42, or that is overly invasive of a person's bodily privacy.  *See United States v. Blake*, 888 F.2d 795, 800 (11th Cir. 1989).

**¶27**        I would conclude that the use of a dog to search the interior of a car falls outside the scope of a general consent to a search, at least in the absence of some circumstances that would put a reasonable person on notice *at the time consent is given* that a dog might be so used.  *See State v. McLeod*, 664 So. 2d 983, 984-85 & 984 n.1 (Fla. Dist. Ct. App. 1995).  As the majority has correctly noted, the scope of consent is defined by what a reasonable person would have understood the consent to mean.  *Jimeno*, 500 U.S. at 251.  The state contends the use of a dog was analogous to any other tool that an officer might use in conducting a search, such as a flashlight, and therefore required no separate consent.  In apparent accord with this analogy, the majority observes that dogs are frequently and openly used as a tool by law enforcement in a number of contexts.

**¶28**        But, in addressing the Fourth Amendment issue before us, the pertinent question is not whether flashlights and dogs bear some analogy as law enforcement tools.  Rather, we must address whether a reasonable person would expect, under the totality of the circumstances here, for her general consent to permit the additional intrusion of a dog into her car.  The encounter here occurred neither at a border checkpoint nor at an airport, where police dogs are commonly encountered, but rather in a parking lot as part of a routine traffic stop.  The officer inquired only whether he could search the car; he neither suggested the object of the search nor that an animal would be used as part of it.  Most importantly, the state has presented no evidence suggesting that, *at the*

*time the consent was given*, Becerra had any awareness that the officer intended to use a dog or that a dog was even present at the scene.[6]

**¶29**    In this context, I cannot agree that a reasonable person would expect that a dog would be deployed to search inside her car during a routine traffic stop.  Nor can I agree that a reasonable person would consider a dog search to involve no greater level of intrusion than a flashlight.  Indeed, there are multiple reasons that a reasonable person might consent to the intrusion of a human officer with a flashlight but refuse entry to a dog.  Flashlights neither shed, drool, nor leave scratches in upholstery.  Unlike flashlights, many people have an allergy to, or fear of, a dog.  And, even those who allow their own familiar pet to travel in their vehicle have reasonable grounds to display a more cautious attitude towards strange dogs.  Such considerations lead reasonable people, in their ordinary lives, to understand that an invitation to a person does not extend to that person's dog.  *See, e.g.*, Abigail Van Buren, *Friend's Dog Is Off the Guest List for Dinner Parties*, Dear Abby (Oct. 24, 2015), http://www.uexpress.com/dearabby/2015/10/24/volunteering-with -infants-may-gratify-wannabe.  Although the majority contends that only an unreasonable person would be uncomfortable with a strange animal entering her private space, dogs are commonly prohibited from entering restaurants, private businesses, shopping malls, and the interior of public buildings.

**¶30**    Neither the state nor the majority has cited any case concluding that a general consent to search a vehicle includes the use of a dog.  Pertinent jurisprudence suggests otherwise.  It is undisputed that a general consent to search a vehicle or home does not include consent to damage property therein.  *See Osage*, 235 F.3d at 521-22; *Strickland*, 902 F.2d at 941-42.  Yet dogs pose an inherent and foreseeable risk of doing precisely that.  The canine propensity for destruction of property is so well known that "my dog ate it" is a

---

[6]The majority observes many vehicles containing dogs are visibly marked as "K-9" units.  Nothing in the record suggests that the officer's car here was so marked.  We therefore cannot consider that possibility among the totality of the circumstances in evaluating the scope of consent.

clichéd excuse for failure to complete schoolwork. *See* Barbara J. Brunner, *Before They Even Start: Hope and Incoming 1Ls*, 48 Duq. L. Rev. 473, 489 (Spring 2010); *see also* Steven R. Selsberg & Maelissa Brauer Lipman, "*My Dog Ate It": Spoliation of Evidence and the Texas Supreme Court's Ortega Decision*, 62 Tex. B.J. 1014, 1014 (Nov. 1999). A dog search inside a vehicle necessarily involves four active paws in a confined space, with the attendant risks of trampling important papers, electronic equipment, or freshly dry-cleaned clothes. And, a dog will predictably both explore the enticing smells of any food being transported and leave behind its hair and dander.

¶31        Moreover, each pertinent case cited by the majority has emphasized circumstances that would alert the defendant that use of a dog was contemplated in the requested search. This reasoning suggests a threshold conclusion that a dog is not otherwise included in a general consent to search. *See United States v. Gonzalez-Basulto*, 898 F.2d 1011, 1013 (5th Cir. 1990); *United States v. Woods*, 445 F. Supp. 2d 1328, 1332-33 (M.D. Ala. 2006); *State v. Paredes*, 167 Ariz. 609, 613, 810 P.2d 607, 611 (App. 1991); *cf. Florida v. Jardines*, ___ U.S. ___, ___, 133 S. Ct. 1409, 1415-16 (2013) (officer accompanied by trained narcotics dog exceeds implied consent for officer alone to enter curtilage); *Dominguez v. State*, 616 So. 2d 506, 506-07 (Fla. Dist. Ct. App. 1993) (consent to search of home by officers did not include consent for use of dog).[7] I would therefore expressly hold that a general consent to a vehicle search, pursuant to a routine traffic stop, does not include an invitation to have a dog enter the vehicle unless the circumstances demonstrate, at the time consent is given, that the search would involve such an additional intrusion.[8]

---

[7]The majority suggests *Jardines* and *Dominguez* are inapposite because they both involved searches of homes, a context wherein privacy rights are elevated. But those cases are premised on the assumption that dogs involve a greater level of intrusion than an officer alone.

[8]Contrary to the suggestion of the majority, this approach, which focuses on the circumstances at the time consent is given, does not erect a bright-line rule requiring an officer to expressly convey his intention to invite a police dog into a vehicle.

¶32 For this reason, Becerra's general consent to allow the officer to search her car did not provide the officer license to usher a dog into her vehicle. We thus must consider whether any of her actions thereafter expanded her consent to allow it.

¶33 As a threshold matter, the state has the burden of showing that a search was within the scope of consent. *State v. Ahumada*, 225 Ariz. 544, ¶ 14, 241 P.3d 908, 912 (App. 2010). If a search exceeds the original scope of consent, or exceeds the boundaries of what a reasonable person would have believed they were consenting to, a defendant who fails to object does not thereby demonstrate consent to the expanded scope of the search. *See United States v. Cotton*, 722 F.3d 271, 274, 277 (5th Cir. 2013); *United States v. Neely*, 564 F.3d 346, 350-51 (4th Cir. 2009); *Osage*, 235 F.3d at 521-22; *United States v. Wald*, 216 F.3d 1222, 1228 (10th Cir. 2000); *Strickland*, 902 F.2d at 941-42. This principle, uncontested in our law, resolves the case before us. The state offers only Becerra's failure to object to the dog's entry into her car as grounds for demonstrating her consent.

¶34 As the majority correctly observes, circumstances present at the time consent is given may allow an inference that the consent includes the use of a dog. *See Gonzalez-Basulto*, 898 F.2d at 1013; *Paredes*, 167 Ariz. at 613, 810 P.2d at 611. And, circumstances occurring after consent is given might arguably illustrate that the suspect originally consented to the use of a dog.[9]

---

[9] Although the reasoning of several cases cited by the majority suggests that a person's actions subsequent to granting consent can be used to demonstrate the scope of consent, that approach arguably contradicts the objective reasonable person standard set forth in *Jimeno,* 500 U.S. at 251. As the Court has emphasized, that standard is objective because it "allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment . . . [and] ensures that the scope of Fourth Amendment protection does not vary with the state of mind of the particular individual." *Michigan v. Chesternut*, 486 U.S. 567, 574 (1988). However, because I conclude that Becerra's post-consent actions would not at any rate demonstrate consent, and because those

¶35　　　　In *Woods*, 445 F. Supp. 2d at 1332-33, the court reasoned that because the defendant was aware that the police officers were looking for drugs, and the defendant spent "some time" talking with the dog-handler before the search began, the defendant was "aware . . . of the dog's presence and its purpose" when he provided consent. Here, the majority takes this principle a step further in concluding that a person's mere failure to object when a dog appears on the scene after consent is given demonstrates that a person intended to consent to a dog search. But, as discussed, mere silence does not generally demonstrate consent as a matter of law and suspects have no duty to narrow or limit a search exceeding the original consent provided. *See Osage*, 235 F.3d at 521-22; *Strickland*, 902 F.2d at 941-42. Rather, the state possessed the affirmative duty to demonstrate that the suspect has agreed to this expansion. *See Ahumada*, 225 Ariz. 544, ¶ 14, 241 P.3d at 912.

¶36　　　　Most importantly, the majority's conclusion—that a person's mere silence during a search implicitly authorizes police to go beyond the boundaries of what a reasonable person would have expected the search to entail—overlooks the practical realities of a police encounter involving a search.

¶37　　　　Here, at the time Becerra gave consent to the search, nothing in the record supports a finding that she was aware the dog was present. The dog did not exit the officer's vehicle until after Becerra signed the consent form. Nor did the officer testify that his patrol car was marked as a "K-9" unit or that the dog would have necessarily been visible to Becerra. And after consent was given, the record shows nothing but Becerra's silence as the search was conducted.

¶38　　　　That Becerra was advised she had the right to withdraw or revoke her consent does not change the calculus. The advisory did not confer upon the officer the right to unilaterally expand upon the consent secured. Nor did the advisory suggest the search would include a dog within her vehicle or that she had any right to oversee

---

actions are at the center of the majority's reasoning, I assume arguendo that such circumstances may be considered.

the search once it began. To the contrary, Becerra was instructed to stand twenty feet away from her car as the search occurred. Put another way, the advisory alerted Becerra that she possessed the hypothetical *power* to revoke the search, but it failed to advise her that she had the affirmative *obligation* to revoke or limit the search if it exceeded her understanding of the consent she had provided. An advisory that a person has a right to terminate a general search does not inform a reasonable person what the search will encompass. *See Jimeno*, 500 U.S. at 251; *Strickland*, 902 F.2d at 941.[10]

¶39      This controlling principle—that mere silence does not equate with consent—is consistent with the "practical realities" of law enforcement. *Wyoming v. Houghton*, 526 U.S. 295, 306 (1999). An officer conducting a search has unique knowledge of what he intends the search to entail and is in the best position to clarify any ambiguities. *See United States v. Infante-Ruiz*, 13 F.3d 498, 505 (1st Cir. 1994). And, it imposes little burden on an officer intending to deploy a dog inside a vehicle to clarify that intention to the vehicle's owner.

¶40      In addition, suspects are typically removed from the near vicinity of searches for officer safety reasons, as Becerra was here, and are not usually able to oversee the search sufficiently to object to any expansion of its scope. *See Arizona v. Gant*, 556 U.S. 332, 362 (2009) (Alito, J., dissenting) (noting law enforcement practice of securing defendants away from vehicle during search incident to arrest). Reasonable people are understandably reluctant to interrupt an officer who is actively conducting a search. For Becerra, that would have required her to either violate the officer's order to stand twenty feet away or to raise her voice to him.

¶41      The majority reasons Becerra was placed on notice that the officer intended to exceed the scope of a general consent when

---

[10]Officers are not required to advise a defendant that consent to a search can be revoked. *See United States v. Drayton*, 536 U.S. 194, 206 (2002). The majority opinion does not address whether a person's mere silence expands the scope of consent when an officer provides no such advisory.

he ushered his dog around the exterior of her car. I cannot agree that a reasonable person would necessarily draw that conclusion. Police dogs are commonly used to search the exterior of vehicles and packages without intruding inside those effects. And the state needs no consent or cause to conduct a dog sniff on a vehicle's exterior. *See Illinois v. Caballes*, 543 U.S. 405, 409-10 (2005). For this reason, an officer's use of a dog around the exterior of a vehicle, an event which implicates no recognized privacy interest, *see id.*, does not objectively demonstrate that an officer intends to invite the animal inside the car.[11] Thus, when an officer brings a dog around the exterior of a vehicle, a reasonable person has no way of determining whether the officer intends to stop there, as police routinely do, or invite the dog inside the car.

¶42 The majority apparently accepts the state's reasoning that Becerra could have objected during the twenty seconds between when the dog first began walking around her car and when it entered. But she was not placed on notice of the officer's intentions until the moment the officer invited the dog into the car. The record is wholly silent as to whether the officer verbally directed the dog to enter or merely so signaled. It is therefore possible that Becerra had no notice the dog would enter her car until it had already done so.

¶43 In short, both our jurisprudence, which prohibits the state from claiming it has secured consent from a suspect's mere silence, and the practicalities of the encounter, wherein the officer alone knows how he intends to deploy his dog, logically place the burden on the officer to clarify the scope of consent. Because the majority's holding bluntly shifts that burden to the suspect, I cannot join in its novel reasoning. To the extent *Paredes* can be read to

---

[11] Because an exterior sniff invades no privacy interest, a person generally has no basis to object to a dog sniff of the outside of her vehicle. *See Caballes*, 543 U.S. at 409-10. I do not suggest with this observation that "a K-9 exterior sniff eliminates a person's ability to withdraw her consent." *Supra* ¶ 19. I contend only that a person's lack of objection to a dog sniff of a vehicle's exterior does not demonstrate acquiescence to a dog search inside of a vehicle—an event which, by contrast, does implicate a privacy interest.

impose on the suspect a duty to object or inquire, that case does not conform to settled jurisprudence.

**¶44**     In sum, no circumstances existed at the time Becerra gave consent that would support an inference such consent included permission to search the inside of her vehicle with a dog.  The state marshalled no evidence, other than her silence, that she agreed to expand the scope of her general consent to include that intrusion.  Accordingly, I would conclude the state failed to meet its burden of demonstrating Becerra's consent to the dog's entry into her vehicle.